# COURT OF APPEALS.

THE PEOPLE and others agt. JOHN KERR and others.

The act of April 9, 1860, conferring authority on the defendants to construct, operate and use a *railroad* (known as the Seventh Avenue railroad) for the conveyance of passengers for compensation through, upon and along certain streets and avenues in the city of New York, is not an *invalid* exercise of legislative power in the absence of any constitutional inhibition or restraint.

The *constitutional inhibition* which forbids the taking of private property for public use " without just compensation," does not apply on the ground that the act makes no provision for compensation to the *corporation* of the city or to the *owners of lots* fronting on the streets, because,

1st. If the *corporation* owns the streets—if the absolute fee be in the corporation, and it *assents* to the construction of the railroad track, as it is alleged they will, it removes any constitutional objection to the law.

2d. The plaintiffs, other than the people, have no property, estate or interest in the land forming the bed of the streets in front of their respective premises to be protected by the constitutional limitation upon the right of eminent domain, because the 178th section of the act of 1813, relating to the city, provided for the

"relinquishment of the lands and premises" constituting such streets, by the original proprietors, and that, upon the final confirmation by the supreme court of the report of the commissioners of estimate and assessment, *the corporation should become and be seized in fee simple of said lands and premises*. Thereafter *no property, estate or interest* in the land included in the streets opened under the act, *remained in the adjacent proprietors*.

3d. But the streets in question are *not owned by the corporation* of New York. They cannot sell or dispose of them, or even divert them to private use. Any and all title or interest which the city has in them is held in trust *for public use ;* is public property, and *not private or municipal*. The city corporation has no property in the streets of a character to be protected by the constitutional limitations upon the right of eminent domain; consequently no property in the soil of the streets to be constitutionally protected *against the acts of the state in regulating their use.*

All public streets or highways are for the use of the *people of the whole state,* whether located in town or country. The interest in such use, or the ownership thereof, is *publici juris ;* and the power of governing and regulating such uses is vested in the *legislature* as the representative of the *whole people*.

*June Term,* 1863.

APPEAL from judgment of the supreme court of the first judicial district.

D. S. DICKINSON, *attorney general, for people.*

H. W. ROBINSON and others, *for defendants.*

WRIGHT, J. Having carefully examined the case, I shall content myself by stating, without elaboration, the conclusions reached :

1. The authority conferred on the defendants by the act of April 9, 1860, to construct, operate and use a railroad for the conveyance of passengers for compensation through, upon and along certain streets and avenues in the city of New York, was not an invalid exercise of legislative power, in the absence of any constitutional inhibition or restraint. The legislature has entire control of any public rights in the highways or streets, and what it authorizes, so that it be constitutional, cannot be complained of by the attorney general or any one else.

2. The act referred to authorizes the defendants to construct and use a railroad track, but makes no provision for compensation to the corporation of the city of New York

or to the owners of lots fronting on the streets to be traversed by the track.  Because the act does not provide for compensation either to the corporation or the adjacent land owners, but the defendants are empowered to use the streets for the transportation of passengers in carriages run on iron rails, without making compensation to any one, it is insisted that the constitutional inhibition which forbids the taking of private property for public use, " without just compensation," applies to the case.  Conceding, however, that the laying down of iron rails in the public streets, without any change of grade, and running carriages thereon by horse power, for the use and accommodation of city passengers, is a material enlargement and change of the nature of the peculiar public easement, and a taking of the property of the owners of the soil of the street, within the meaning of the constitutional provision, it is necessary before the validity of the act can be questioned by the attorney general or the other plaintiffs in this action, that the rights of the latter or of the municipal corporation should be those of absolute owners of the fee of the land embraced within the streets.  Indeed, if the city corporation owns the streets in the same manner and to the same extent as an individual does his lands, and its property in them, is of such a character as to be protected by the constitutional limitation upon the right of eminent domain, the action cannot be sustained.  The corporation is made a defendant upon the allegation that it is about to consent to the construction of the railroad track by Kerr and his associates.  If it owns the streets—if the absolute fee be in the corporation—and it assents to the additional burden, it removes any constitutional objection to the law. · The attorney general certainly could not be heard to maintain that that was a public nuisance which was authorized by a constitutional act of the legislature.

3. The plaintiffs, other than the people, have no property, estate or interest in the land forming the bed of the

streets in front of their respective premises, to be pro-
tected by the constitutional limitation upon the right of
eminent domain. The streets in question were voluntarily
or compulsorily, and upon due compensation made therefor,
tranferred from the individual proprietors to the corpora-
tion, in fee, according to the 178th section of the act of
1813, relating to the city. (2 *R. L.*, 409 *to* 416.) It is
found as a fact, and conceded, that under this act of 1813
all the lands in the several ·streets on which the plaintiffs
are abutting land owners were either taken for streets,
under section ·178 of that act, under compulsory appraisal,
or ceded by the lot owners upon an agreed valuation, pur-
suant to such section. Unlike our highway acts, which
condemned to public use a mere easement only, (2 *R. L.*,
275,) this statute provided for the " relinquishment of the
lands and premises" constituting such streets, by the ori-
ginal proprietors, · and that upon the final confirmation by
the supreme court of the report of the commissioners of
estimate and assessment, the corporation should become
and be seized in fee simple of said lands and premises.
After such relinquishment and vesting of the fee in the
city corporation, no property, estate or interest in the land
included in the streets opened under the act, remained in
the adjacent proprietors. The possibility that the public
use, for which the land was taken, might cease, is not, I
think, to be deemed as leaving in the persons from whom
it was taken a right to have the land again in that event.
(*Howard* agt. *The Mayor, &c. of New York*, 3 *Seld.*, 314.) An
interest, though technically vested, so limited as to be sub-
sequent in point of enjoyment to a prior present ownership
that may last forever, is not to be regarded as *property*, or
entitled, as such, to immunity from destruction at the will
of the government. If, however, it were conceded that
those from whom the land was taken have some remote
reversionary right, in case the streets shall cease to be

used as highways, the possibility of reverter is too remote and contingent to be of any appreciable value.

4. The streets in question are not owned by the corporation of New York. The corporation cannot sell or dispose of them, or even divert them to private use. Any and all title or interest which the city has in them is held for public use ; is public property, and not private or municipal. By an exercise of state power they were taken or confiscated to public use, and compensation made for them, not from any fund levied on the corporation or its corporate property, or on the city or its inhabitants generally, but by an exercise of the taxing power of the state. The legislature acted under its taxing power in raising the fund or means of payment. It cannot be known that a single city corporator contributed any sum toward the purchase ; and for anything that appears, the streets in question *may have been wholly paid for by non-residents.* By force of the statute of 1813, the corporation became seized in fee of the land embraced within the streets, not absolutely as private or corporate property, but in trust for public use. The fee being vested in the corporation, the statutory command and authority followed to take possession and hold the streets " in trust, that the same be appropriated and kept open as public forever, in like manner as the other public streets in said city are, and of right ought to be." (2 *R. L., p.* 408, §§ 177, 178.) It would be strange, indeed, if these streets belonged to the city and were beyond public control, when they were acquired by the exercise of the right of eminent domain, and were confiscated to public use, when vested in the corporation, by the proceeding to open them. I am clearly of the opinion that the city corporation has no property in the streets of a character to be protected by the constitutional limitations upon the right of eminent domain. It is perhaps unnecessary in this case to consider the question whether, in other streets of the city not opened under the act of 1813, the corporation has

People agt. Kerr.

a property in them to be thus protected; but if it were, my conclusions would be the same. Whether the fee or ownership of the bed of the ancient streets was originally vested in the government, or the land was taken and condemned for phblic use, under colonial or state acts, upon paying to the proprietors a compensation for the soil or easement, or was voluntarily ceded to the public, it seems plain to me that the corporation has no property in the soil of the streets to be constitutionally protected against the acts of the state in regulating their use. It cannot be pretended that the absolute title and estate in the land embraced within the streets have ever been granted to the corporation from any source. Whatever estate or interest it holds, either conferred by the Dongan charter or by the state, is in trust for the public use. It is not a trustee for the inhabitants of the city alone, but for the whole people. The corporation may exercise this trust—it may have control over the public streets, or the power of regulating their use, but that is not corporate property, nor has the corporation, or any of its corporators, a private interest therein, or a right to derive profit therefrom.

5. The effect and object of the act of 1813, in relation to the streets in question, were to establish a public trust for the benefit of the whole people. All public streets or highways are for the use of the people of the whole state, whether located in town or country. The interest in such use, or the ownership thereof, is *publici juris*. It is a prevalent notion that the inhabitants of the city have some distinct and peculiar right to the use of the streets, not pertaining to the whole people, and that the corporation having paid for them they are, in a sense, corporate property, and the right to govern and regulate their use a sort of corporate franchise. But this is an erroneous view; as has been said in regard to the streets opened under the act of 1813, compensation was made, not from the city treasury, or from corporate property, but the fund for payment

was raised by an exercise of the taxing power of the state. So also as to other streets, no compensation has been paid by the municipality, whether they were originally vested in the government, or under colonial or state acts opened by the exercise of the right of eminent domain. The character which the corporation has uniformly sustained has been that of trustee for the public. It was as such trustee that the state in 1793 conveyed to it all its title, estate and interest in such streets. (*Greenleaf's Laws.*)

The interest in the use of the streets being *publici juris*, the power of governing and regulating such uses is vested in the legislature as the representative of the whole people. It is a part of the governmental or political power of the state, in no way held in subordination to the municipal corporation. If the legislature could not authorize the use of the streets in the way prescribed in the act of April, 1860, the power exists nowhere. The permission of the municipal government, the mere creature existing at the will of the state, would add nothing to the power. I know of no restraint upon legislative action, unless it can be found in the constitution, and there is nothing there but the limitation on the exercise of the right of eminent domain. The city corporation, as freeholder of the streets in trust for public use as highways, is but an agent of the state. Any control which it exercises over them, or the power of regulating their use, is a mere police or governmental power delegated by the state, subject to its control and direction, and to be exercised in strict subordination to its will. The corporation, as such, has no franchise in connection with the use of the streets for the transportation of passengers. Whatever power or authority it possesses in respect to the carriage of persons for hire, was derived from acts of the state legislature, which power may be resumed by the grantor, at its pleasure. I am aware that what is called the franchise for carrying persons for

hire over the streets of the city, and for receiving a pecu-
niary recompense for the enjoyment of this privilege by
others, is claimed to have been enjoyed by the corporation
from time immemorial, and to have been one of the privi-
leges or franchises confirmed to it by the Montgomerie
charter. But this rests in mere claim. Neither of the
ancient charters granted to the city corporation the office
of carrier of persons, or any power of licensing, or receiving
fees from others for the privilege. The Montgomerie char-
ter did indeed grant to the corporation " the office of cart-
age, carriage and portage of all goods, wares, merchandise
and other things to be carted or carried in or through said
city or any part thereof." (*Mont. Charter*, § 19.) But it
has not been supposed that even this was an irrevocable
grant of property.

I discover no obstacle, therefore, to state legislation in
respect to the use as well of public streets and highways
in the city as in the country. The power which the muni-
cipal corporation holds and exercises in controlling and
regulating the use of the streets of New York has been
delegated to it by the state. It is a grant of governmental
power, for local purposes, subject to the control of the
supreme power in the state. The legislature may at any
time resume the power delegated.

It is not necessary that the courts should maintain or
even approve of the policy and justice of that species of
legislative interference with the local affairs of a great
municipality which the act under consideration discloses.
The question is simply one of power. I cannot doubt that
the power exists with the state legislature, without the
consent or license of the municipal corporation, to so con-
trol the use of the public streets of the city as to authorize
the construction of a railroad track therein, on which city
passengers may be transported for hire. It can make no
difference with the question that the right granted is in

the nature of a franchise, for it proceeds from the sovereign. The judgment of the supreme court should be affirmed.

All the judges concurred substantially in the foregoing opinion.